# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**WILLIE J. HUDSON,**
                    **Plaintiff,**

        **v.**                                          **Case No. 06-C-1327**

**MICHAEL ASTRUE,**
**Commissioner of the Social Security Administration,**
                    **Defendant.**

---

## DECISION AND ORDER

Plaintiff Willie Hudson applied for social security disability benefits, claiming that he was unable to work due to pain associated with arthritis and degenerative joint disease, fatigue associated with Hepatitis C, and anxiety and irritability related to mental impairments. The Social Security Administration ("SSA") denied his application, as did an Administrative Law Judge ("ALJ") after a hearing. Plaintiff now seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

### A. Judicial Review

The court's task on judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, the responsibility for that decision falls on the

ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. Id.

However, this does not mean that the court acts as an "uncritical rubberstamp." Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1983). In determining whether substantial evidence exists, the court must review the entire record, taking into account both evidence in support of the ALJ's conclusions and anything that fairly detracts from their weight. Young v. Sec'y of Health and Human Services, 957 F.2d 386, 388-89 (7th Cir. 1992). The court cannot let stand a decision that lacks either evidentiary support or an adequate discussion of the issues. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). Even if substantial evidence seems to support the decision, the court cannot uphold it if the ALJ skipped over important evidence, Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996), or failed to build an accurate and logical bridge between the evidence and the result, Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

Likewise, if the ALJ commits an error of law, the court "may reverse without regard to the volume of evidence in support of the factual findings." White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999). The ALJ commits such an error if he fails to abide by the SSA's regulations and rulings for evaluating disability claims. See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

## B. Disability Standard

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is presently working; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether any of the claimant's impairments are listed by the SSA as

2

being presumptively disabling;[1] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work;[2] and (5) if not, whether the claimant is able to perform any other work. Skinner v. Astrue, 478 F.3d 836, 844 n.1 (7th Cir. 2007).

The claimant carries the burden of proof at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004). The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. The ALJ may not rely on the Grid and must consult a VE if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work, although he may use the Grid as a "framework" for his decision. E.g., Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Applications and Administrative Proceedings

Plaintiff first filed for social security disability benefits in May 2001. The SSA denied that application initially and on reconsideration, as did ALJ Margaret O'Grady after a hearing in a

---

[1]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

[2]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96-8p.

3

decision issued on May 16, 2002. (Tr. at 37-44.) The Appeals Council denied plaintiff's request for review of ALJ's O'Grady's decision on August 14, 2002 (Tr. at 25-26), and plaintiff did not pursue the matter further.

On June 7 and 14, 2002, plaintiff filed the instant applications for benefits, alleging a disability onset date of May 17, 2002 (the day after ALJ O'Grady's decision denying his previous application). (Tr. at 75; 666.)[3] The SSA again denied the application initially (Tr. at 50; 665) and on reconsideration (Tr. at 51; 664), and plaintiff again requested a hearing (Tr. at 74). On May 8, 2003 (Tr. at 930), he appeared with counsel before ALJ Donald Limer, who issued a decision on July 25, 2003 denying the application (Tr. at 683-88). Plaintiff requested review by the Appeals Council (Tr. at 691), which remanded the matter for further proceedings (Tr. at 696-98). On October 4, 2004, plaintiff appeared with counsel before ALJ Robert Senander (Tr. at 702-05), who later issued the adverse decision at issue in the present appeal.

**B. Hearing Testimony on Remand**

**1. Plaintiff**

Plaintiff testified that he was forty-five years old, 5'7" tall and 157 pounds, with a high school education. (Tr. at 957; 959.) He served in the Army from 1977 to 1980 and at the time of the hearing was receiving 10% service-connected disability benefits from the Veterans' Administration ("VA") related to a leg injury. (Tr. at 960.) Plaintiff indicated that his past employment included general laborer jobs involving assembling and packaging, janitorial duties and work as a dietary aide. (Tr. at 963-75.) He participated in a VA domiciliary program doing housekeeping training in 2001 but was kicked out of the program for tardiness. (Tr. at 961-62.)

---

[3]Plaintiff applied for both disability insurance benefits ("DIB") and supplemental security income ("SSI"). For purposes of this appeal, there are no relevant differences between the two.

4

Plaintiff testified that he was unable to work due to chronic pain in his hip, legs, back, shoulder and stomach, fatigue, and anxiety. (Tr. at 975; 980.) He indicated that took various medications daily, which made him drowsy. (Tr. at 978-79.) He stated that he primarily spent his time eating, sleeping and watching TV, and that if he had no business to take care of he slept nineteen out of the twenty-four hours in a day. (Tr. at 980-81.) He did some cleaning of his house and his own grocery shopping, but denied any hobbies or social interaction. (Tr. at 982; 985.)

### 2. VE

The VE, Paul Maulucii, classified plaintiff's past employment as light to medium, unskilled work. (Tr. at 1001.) The ALJ then asked two hypothetical questions. The first assumed a person of plaintiff's age, education and experience, limited to light, low stress, unskilled work involving no public contact. (Tr. at 1005.) The VE testified that such a person could perform plaintiff's past janitorial work, but not the hand packaging and dietary aide jobs. (Tr. at 1006.) The ALJ then added the restriction of only occasional use of the right arm, which led the VE to opine that none of the previous jobs could be done. (Tr. at 1006.) However, the VE identified other jobs the person could do, under both hypotheticals. Under the first, the person could work as a material handler, with 1600 jobs in Wisconsin; food preparer, with 12,000 jobs in Wisconsin; and dishwasher, 2500 jobs in Wisconsin. (Tr. at 1006-07.) Under the second hypothetical, the person could not perform the material handler and dishwasher jobs but could work in food preparation, with about 4000 jobs in Wisconsin. (Tr. at 1007-08.)

### C. Medical Evidence

ALJ Senander received a voluminous amount of medical evidence gathered by the SSA

5

in connection with plaintiff's applications.  Plaintiff, a veteran, received much of his treatment at the Milwaukee Veteran's Administration Medical Center ("VAMC") but saw other, outside doctors as well.  VA doctors began treating plaintiff for Hepatitis C in April 1999, although plaintiff indicated that he was first diagnosed with the disease in 1990.  (Tr. at 851-52.)  In September 1999, plaintiff saw a VA nurse practitioner ("NP"), Terrence Hess, complaining of back pain after an assault.  (Tr. at 860.)  NP Hess advised rest and use of medications previously provided by emergency room personnel and prescribed acetaminophen.  (Tr. at 861.)  On September 20, 1999, plaintiff reported that his back pain was better with the muscle relaxers he had been provided by the ER.  (Tr. at 855.)  Plaintiff entered the VA's domiciliary program in October 2000.[4]  On November 30, 2000, plaintiff saw NP Hess, complaining of arm, back and leg pain.  (Tr. at 852.)  Hess continued plaintiff in the domiciliary program and referred him for physical therapy and a consult with the orthopedic clinic.  (Tr. at 854-55.)

In January 2001, plaintiff sought treatment for cocaine use and stated that he wanted to be considered for the housekeeping training program.  (Tr. at 759.)  On January 30, 2001 plaintiff saw NP Hess complaining of chest and right shoulder pain.  Hess ordered an EKG and stress test, which were apparently within normal limits. (Tr. at 847-48.)  In March 2001, NP Hess ordered a right hip x-ray related to plaintiff's complaints of pain in that part of his body, which revealed early osteo-arthritis; Hess suggested physical therapy. (Tr. at 846.)  On March 27, 2001, plaintiff returned to NP Hess, who assessed atypical chest pain, anxiety and hepatitis C.  After a consult with cardiology, NP Hess decided that no further intervention – aside from controlling risk factors – was needed.  (Tr. at 843-46.)

---

[4]The VA apparently terminated plaintiff from the program in April 2001 for tardiness.

On May 15, 2001, plaintiff underwent an upper extremity MRI at the VA, which was normal. (Tr. at 381-82.) On June 19, plaintiff saw NP Regina Deringer at the VA, seeking a work excuse for his back so he could get food stamps. However, because there was little documentation related to this concern in his chart and plaintiff appeared to be in no acute distress, NP Deringer refused to completely restrict him from working. (Tr. at 490-91.) Plaintiff did receive some physical therapy for shoulder pain around this time. (Tr. at 489-90; 491.)

On July 2, 2001, plaintiff saw NP Arnold Valerius at the VA about his hepatitis C, but it was decided that his living situation had to be stabilized before he could be considered for treatment.[5] (Tr. at 488-89.) On July 23, plaintiff saw psychiatrist Brian Demuri at the VA, indicating that he slept through a 10:00 a.m. appointment, which he blamed on his medication. (Tr. at 487.) Dr. Demuri discontinued the medication and offered another, but plaintiff declined. (Tr. at 488.)

On August 15, 2001, plaintiff saw Dr. Susan Powers, another VA psychiatrist, indicating that he needed medication for his anxiety, and Dr. Powers prescribed Buspirone. (Tr. at 486-87; 841-43.) On October 30, plaintiff returned to Dr. Powers, who diagnosed poly-substance dependence and anxiety, not otherwise specified ("NOS"), with a GAF of 60.[6] (Tr. at 483; 839.) Plaintiff indicated that his medication was helping but he still felt jittery sometimes, so Dr. Powers increased the dosage. (Tr. at 484-85; 840-41.)

On November 7, 2001, plaintiff established primary care with Dr. Janice Litza at the

---

[5]Plaintiff was apparently homeless at the time, having been removed from the domiciliary in April 2001.

[6]GAF ("Global Assessment of Functioning") is an assessment of the person's overall level of functioning. Set up on a 0-100 scale, a score of 60 denotes moderate symptoms. Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

Clarke Square Health Center, based on his reported dissatisfaction with his care at the VA. Plaintiff complained of stomach and bilateral leg pain. Dr. Litza assessed gastritis verses reflux disease and switched him from Zantac to Protonix, and osteoarthritis, starting him on Ultram. (Tr. at 528-29.) Plaintiff returned to Dr. Litza on December 12, complaining of back pain after doing a lot of lifting at a volunteer job, and she provided Flexeril. (Tr. at 522.)[7] Plaintiff also requested that Dr. Litza prepare a form in connection with his disability application, but on January 15, 2002, Dr. Litza told him that she believed low stress work would be beneficial for him. (Tr. at 519.)

On January 22, 2002, plaintiff saw Dr. Thomas Puetz of Digestive Disease Specialists of Wisconsin for evaluation of his elevated liver function tests. Dr. Puetz indicated that plaintiff had a history of hepatitis B and C infections, which were diagnosed at the VA Hospital but not treated. Plaintiff also had a history of alcohol-induced pancreatitis. Plaintiff's only complaint at the time was fatigue. (Tr. at 154.) Dr. Puetz ordered further testing (Tr. at 155), which revealed hepatitis C (Tr. at 147-53).

On January 24, plaintiff returned to Dr. Powers at the VA, who diagnosed poly-substance dependence and anxiety, NOS, with a GAF of 60. Plaintiff became angry at Dr. Powers because she would not fill out a form for his social security disability application, as she believed he could perform a very low-stress job. (Tr. at 479.) He asked her to change her opinion, and when she refused he said he wanted a new psychiatrist. (Tr. at 836-38.)

--------------------

[7]On December 17, 2001, plaintiff saw NP Derringer at the VA, complaining of shoulder, hip and leg pain. He reported seeing another physician on the outside, who provided Ultram, Protonix and Flexeril. (Tr. at 481-82.) On January 8, 2002, plaintiff underwent a CT scan related to his complaint of abdominal pain, which was unremarkable other than gas and stool distending the colon. (Tr. at 231.)

8

On January 28, 2002, plaintiff saw NP Derringer at the VA complaining of chest pain. Derringer indicated that he could continue taking pain pills provided by an outside doctor and ordered an echocardiogram.  (Tr. at 477.)

On February 4, 2002, plaintiff saw his new VA psychologist, Kenneth Cole, for a one hour session.  Plaintiff complained of being wrongly kicked out of the domiciliary the previous year and did not acknowledge any wrongdoing on his part.  Plaintiff appeared to be attempting to convey a very high functioning exterior, which in some ways conflicted with his history as evidenced in the records.  (Tr. at 476-77.)  Plaintiff returned to Dr. Cole on February 12 and again wanted to discuss his eviction from the domiciliary program.  He was very talkative and reluctant to acknowledge his role in conflicts.  (Tr. at 476.)  Plaintiff again saw Dr. Cole on February 28, again placing blame on external sources for his misfortunes and drug use.  (Tr. at 475-76.)

On February 18, 2002, plaintiff saw Dr. Litza complaining of intermittent atypical chest pain, which Dr. Litza thought was likely not cardiac in origin.[8]  (Tr. at 516.)  On February 28, plaintiff saw Dr. Puetz's physician's assistant ("PA"), Emily Copps, for re-evaluation of his hepatitis, and she discussed treatment regimens, including interferon injections and Ribavirin pills.  He complained of insomnia, lack of appetite and weakness.  PA Copps suggested an ultrasound guided liver biopsy before proceeding with treatment. (Tr. at 146.)  A March 5, 2002 liver biopsy revealed chronic hepatis C, grade 2 inflammation and stage 2 fibrosis.  (Tr. at 142; 221-28.)

On March 12, 2002, plaintiff returned to Dr. Powers, who noted a GAF of 60 with

_____

[8]On April 15, plaintiff underwent a cardiac assessment at the VAMC, which revealed no acute disease but mild obstructive pulmonary disease or possibly asthma.  (Tr. at 470.)

sufficient control of general anxiety and continued his medications.  (Tr. at 473-75.)  On March 27, plaintiff saw Dr. Cole, discussing his case for readmission to the domiciliary.  Dr. Cole tried to focus plaintiff on his personal issues, but he was very resistant.  (tr. at 472.)  Plaintiff returned to Dr. Cole on April 3, continuing to bring in documentation of how he had been "wronged" by others.  Dr. Cole told him this was the last session to go over these forms/papers as they detracted from a focus on psychological issues.  (Tr. at 471.)  On April 17, plaintiff saw Dr. Cole and again had difficulty acknowledging any role he played in the conflicts that prompted his removal from the domiciliary program.  (Tr. at 469.)

On April 20, Dr. David Sovine examined plaintiff in connection with his application for VA benefits.  Plaintiff reported irritability, anger and depression, and being easily provoked.  He also complained of periods of feeling panicky and frustrated with diminished short-term memory.  (Tr. at 390.)  Plaintiff reported receiving treatment for alcohol and drug abuse while in the VA's domiciliary program from October 15, 2000 through April 7, 2001, but indicated that he was now jobless and homeless.  (Tr. at 391.)  Plaintiff demonstrated no significant signs of anxiety or depression but felt he had been "black balled" by the VA system.  He complained of short-term memory problems but recalled three objects after three minutes without difficulty.  Dr. Sovine diagnosed adjustment disorder with mixed emotional features, alcohol and drug dependence in remission, and impulse control personality trait, with a GAF of 77.[9]  (Tr. at 392.)  Plaintiff complained of significant anxiety, but Dr. Sovine saw no evidence of this complaint.  His major struggles appeared to be with AODA issues.  (Tr. at 393.)

On April 30, plaintiff saw Dr. Cole, speaking in boisterous tones and quite animated in

_____

[9]Such a score is indicative of only mild symptoms.  <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32-34 (4th ed. 2000).

discussing a conflict with an old woman who bumped into him at a bus stop. He seemed resistant to accepting his role in conflicts and attempted to justify his actions. (Tr. at 386; 469.)

On May 6, plaintiff went to the Aurora Sinai Medical Center ER with complaints of foot pain, but an x-ray was normal. (Tr. at 211-12.) ER staff provided pain medication, an Ace bandage and crutches to bear weight, and discharged plaintiff. (Tr. at 216-18.)

On May 8, plaintiff saw Dr. Powers at the VA, who again diagnosed poly-substance dependence and anxiety, NOS, with a GAF of 60. (Tr. at 383.) Dr. Powers's impression was that plaintiff's general anxiety was under sufficient control. She switched one of his medications. (Tr. at 384; 832-35.)

On May 22, plaintiff saw Dr. Litza complaining of an injury to his ankle, pain in his left knee, and redness and irritation of his right eye. (Tr. at 514.) Dr. Litza started plaintiff on Celebrex for his knee pain and refilled other medications for gastritis and chronic urticaria.[10] (Tr. at 515.)

On May 29, plaintiff told Dr. Cole that he was upset that disability benefits had been denied, but he was nevertheless persistent in pursuing such benefits. (Tr. at 379.) Plaintiff returned on June 4, and Dr. Cole encouraged him to focus on active steps he could take to help himself, rather than relying on external sources of support. (Tr. at 374.) On June 6, Dr. Cole completed a report, in which he noted no cognitive or mental health deficits, but he did recommend continued psychotherapy to help plaintiff better cope with stress. (Tr. at 157-58.)

On June 17, 2002, while intoxicated, plaintiff attempted to kill himself by jumping out of a third story window. (Tr. at 160-67.) He was taken to Froedert Hospital, medically cleared,

---

[10]Urticaria is an eruption of itching wheals. Stedman's Medical Dictionary 1918 (27th ed. 2000).

11

then sent to the Genesis program for detoxification. (Tr. at 369; 422.) Plaintiff was discharged the following day, then presented at the Aurora Sinai Emergency Department with a cough and multiple pain complaints. (Tr. at 202-06; 208; 422.) He was instructed to follow up with his primary care physician, Dr. Litza, to take the Celebrex she previously prescribed, and provided medication for his cough. (Tr. at 171; 209-10.) A chest x-ray was normal. (Tr. at 207.) After his discharge, plaintiff claimed to continue hearing voices, so a friend brought him to the VA ER, where he was admitted for further treatment and started on Seroquel. (Tr. at 172; see Tr. at 344-45; 359; 363-72; 422.)

Patty Guedet, M.D., a psychiatrist at the VA, saw plaintiff on June 19, 2002, noting that he had a history of poly-substance abuse and anxiety, and presented with suicidal ideation secondary to frustration with life and lack of support. He stated that he started hearing voices about a week earlier telling him to kill himself. (Tr. at 356.) On June 20, Dr. Guedet noted that plaintiff continued to voice varied and dramatic somatic complaints. She was unclear if his somatization was for primary or secondary gain, but continued his medications. (Tr. at 347.) On June 21, Dr. Guedet noted diagnoses of poly-substance dependence; psychosis, NOS; mixed personality disorder with paranoid and narcissistic traits; and a GAF of 55.[11] Dr. Guedet advised plaintiff to follow up with Dr. Powers for medication management. (Tr. at 335.) In her discharge summary, Dr. Guedet noted that plaintiff's main focus during his hospitalization was his various somatic complaints with pain in both legs, bumps on his eye and coughing up green phlegm. Her diagnostic impression was that plaintiff had primarily characterologic pathology with paranoid and narcissistic traits. (Tr. at 424.)

_____

[11]Such a score reflects "moderate" symptoms. Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

12

On June 21, 2002, plaintiff returned to Dr. Litza, and relayed his hospitalization after his suicide attempt. He continued to feel frustrated with his current medical problems, which included right knee pain and swelling and mild posterior right shoulder pain. (Tr. at 511.) His foremost problems were his financial and transient living situation. Dr. Litza also believed he had arthritis of the right knee and should continue taking Salsalate on a daily basis. (Tr. at 512.) Plaintiff complained of a chronic cough, which Dr. Litza believed may be a smoker's bronchitis. She provided medications for that problem. (Tr. at 513.)

On June 24, 2002, Dr. Litza prepared a medical assessment form related to plaintiff's arthritis, indicating that he suffered chronic pain and fatigue, moderate in severity. (Tr. at 173.) She indicated that plaintiff could stand/walk about two hours and sit about four hours in an eight hour day. She further indicated that he would have to take two unscheduled ten minute breaks during the course of a work day based on his symptoms including pain and weakness. She stated that he could frequently lift less than ten pounds, occasionally lift ten pounds, but rarely lift more than that. (Tr. at 174.) Finally, Dr. Litza indicated that plaintiff had a low tolerance for frustration due to his transient living situation, but that he had made his scheduled appointments and taken all prescribed medications. (Tr. at 175.)

On the same date, Dr. Litza completed a medical capacity and examination form, in which she listed plaintiff's diagnoses as arthritis, chronic hepatitis and depression. On this form, she indicated that plaintiff could occasionally lift up to twenty pounds, ten pounds frequently; stand/walk at least two hours in an eight hour work day; and had no limitation on his ability to sit during an eight hour day.[12] (Tr. at 176.) She further opined that plaintiff had

---

[12]It is unclear why the doctor varied in assessing plaintiff's ability to lift and sit in these two form reports completed on the same day.

Case 2:06-cv-01327-LA   Filed 10/29/07   Page 13 of 40   Document 26

no problems with use of the hands but had to be able to alternate positions regularly. She indicated that his medications caused no side effects, but that his mental abilities were impaired in that he had low tolerance for frustration, difficulty communicating his needs and experienced panic attacks. She concluded that plaintiff could work four to six hours per day (five days per week) with these restrictions. (Tr. at 176A.)

In a hepatitis assessment form completed on June 26, 2002, Dr. Litza indicated that plaintiff experienced symptoms including arthralgia, anorexia, general malaise, difficulty thinking/concentrating and abdominal complaints. She characterized his pain as moderate in severity. (Tr. at 177.) She indicated that these symptoms would occasionally interfere with the attention and concentration needed to perform even simple work tasks. She further indicated that plaintiff was unable to complete detailed or fast paced tasks, meet strict deadlines, or be exposed to work hazards like heights or moving machinery. (Tr. at 178.) She opined that plaintiff could continuously sit more than two hours and continuously stand forty-five minutes. She stated that he could stand/walk a total of about two hours in an eight hour day and sit about four hours in an eight hour day. She again indicated that he would need to take two unscheduled ten minute breaks during the work day based on pain and fatigue. (Tr. at 179.) As on the first report, she indicated that he could frequently lift less than ten pounds, occasionally lift ten pounds, and rarely lift more. She stated that he could frequently twist and occasionally stoop. She estimated that he would be absent about four days per month based on his impairments. (Tr. at 180.) She concluded that plaintiff had a very low tolerance for frustration based on his transient living situation, which had to be stabilized before he could begin interferon treatment for his hepatitis C. (Tr. at 181.)

On June 28, 2002, plaintiff returned to Dr. Litza, stating that his mood was better and

14

he had not been drinking. However, plaintiff continued to complain of pain in his right shoulder and knee, which Dr. Litza believed may be the result of osteoarthritis. She ordered x-rays to confirm her impression. (Tr. at 509.) On July 1, plaintiff underwent x-rays of the hip, pelvis and knee, which were negative save for very early osteophyte formation in the medial femoral condyle. (Tr. at 195-200.)

On July 11, plaintiff saw Dr. Powers, who again noted diagnoses of poly-substance dependence and anxiety, NOS, with a GAF of 60. Plaintiff presented as angry about his homelessness and financial situation, and that Dr. Cole left the VAMC and he had not been set up with another therapist. (Tr. at 330.) On mental status exam, plaintiff was alert and cooperative, but angry with poor to fair insight. Dr. Powers continued him on Seroquel and Gabapentin. (Tr. at 331.) Dr. Powers noted sufficient control of general anxiety, but a recent alcohol relapse. (Tr. at 830-32.) On July 23, plaintiff saw his new VA counselor, Dennis Thompson, initially fairly pleasant, then escalating into his "usual presentation, according to notes from Dr. Cole, of righteous indignation and sense of entitlement." (Tr. at 324.)

On August 9, Dr. Litza reviewed plaintiff's x-ray results related to his complaint of bilateral knee pain, which revealed mild osteoarthritis of the knees bilaterally. Dr. Litza recommended regular exercise to strengthen the muscles around the joints. (Tr. at 506.)

On August 20, plaintiff returned to counselor Thompson, complaining about the denial of his requests for VA and SSA benefits. (Tr. at 322.) On August 23, he saw Dr. Powers, who again diagnosed poly-substance dependence and anxiety, NOS, with a GAF of 60. Plaintiff complained of feeling tired all the time, and Dr. Powers adjusted his medications. (Tr. at 319-20; 826-28.) On August 29, 2002 Dr. Powers wrote a letter indicating that plaintiff was on a

15

number of sedating medications and needed afternoon appointments.  (Tr. at 618.)[13]

In early September 2002, plaintiff saw a chiropractor, Michael Tremba, who diagnosed a probable strain/sprain of plaintiff's back.  Dr. Tremba took an x-ray of plaintiff's lumbar spine, which was normal aside from a slight decrease in lumbar saggital curve from L1-L4.  (Tr. at 263-65.)

On September 16, 2002, plaintiff saw a VA nurse after being referred by the ER regarding homelessness.  The nurse mentioned the VA domiciliary program and Vet's Place, but plaintiff indicated that he had been kicked out of both and did not wish to return.  (Tr. at 310.)  He stated that he wanted the VA to grant him some money for his own apartment and his social worker to write a letter indicating that he needed a stable residence and steady income.  He indicated that he did not want to hurt anyone but might have to if the VA did not give him money.  (Tr. at 311.)  Also on September 16, plaintiff saw NP Deringer about his pain complaints.  He was provided some food and discharged in stable condition.  (Tr. at 314-18.)

On September 24, a VAMC psychologist, Victoria Wiese, examined plaintiff related to his claim for VA benefits.  (Tr. at 280.)  Dr. Wiese noted that plaintiff received substance abuse treatment and participated in the VA's domiciliary program until he was discharged for non-compliance.  (Tr. at 281-82.)  Plaintiff complained of hearing voices telling him to harm himself, pain all over and sluggishness due to his medications.  On examination, Dr. Wiese found plaintiff oriented, with relatively intact attention and concentration.  Dr. Wiese estimated his intelligence to be low average.  (Tr. at 284.)  She offered diagnoses of schizo-affective disorder, with a history of adjustment disorder and cocaine and alcohol dependence; mixed

---

[13]She wrote a similar letter on July 14, 2004.  (Tr. at 619.)

personality disorder with narcissistic and histrionic traits; and a GAF of 40.[14]  (Tr. at 285.)

On September 26, plaintiff again saw NP Deringer at the VAMC, complaining of low back pain, knee pain, abdominal pain and headaches.  He requested an excuse from work, but NP Deringer doubted that she would issue one because plaintiff had no "obvious limitations." (Tr. at 304.)  She ordered x-rays, which came back normal (Tr. at 307-08), then declined to write a letter excusing plaintiff from working (Tr. at 301).  On September 27, plaintiff saw his VA counselor, Thompson, presenting "in the usual way, demanding and entitled."  He calmed down after being allowed to vent about his disability claims.  (Tr. at 300.)

On October 4, plaintiff returned to Dr. Litza, complaining of headaches and abdominal pain.  (Tr. at 501.)  Dr. Litza suspected migraines or tension headaches, but ordered an MRI to assure plaintiff that he had no other pathology.  She noted that his orthopedic complaints were being evaluated at the VA.  Dr. Litza believed that plaintiff's abdominal pain may be secondary to hepatitis.  (Tr. at 502.)

On October 8, plaintiff visited the VAMC complaining of back and knee pain but with minimal clinically reproducible symptoms.  (Tr. at 297.)  On October 11, he saw Thompson for counseling and appeared less demanding with stable mood.  (Tr. at 296.)  On October 22, plaintiff was cooperative and in no distress with stable mood.  (Tr. at 295.)  Plaintiff returned to Thompson on October 31 and was fairly upbeat.  (Tr. at 294.)  Plaintiff also visited the St. Luke's Hospital ER on that date complaining of persistent headaches, but a CT scan was normal.  (Tr. at 245-46.)

_____

[14]A GAF score of 40 denotes a major impairment in several areas such as work or school, family relations, judgment, thinking or mood.  Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

17

On November 7, plaintiff saw Dr. Powers at the VAMC, and she again assessed poly-substance dependence and anxiety NOS, with a GAF of 60. (Tr. at 291.) On mental status exam, plaintiff was cooperative but his mood was upset. Dr. Powers continued his medications. (Tr. at 292; 824-26.) Plaintiff saw Thompson on November 11, irritable and frustrated by his living situation. (Tr. at 288.)

On November 18, plaintiff underwent a lumbar MRI at the VAMC, which revealed single level desiccated disc at the L5-S1 level without critical spinal stenosis. (Tr. at 565-67; 576.) Plaintiff saw Dr. Kenneth Schaufelberger, an orthopedist, at the VAMC on November 26, complaining of knee and back pain, but the doctor saw minimal clinically reproducible symptoms and relatively normal x-ray and MRI tests. He sent plaintiff for physical therapy and prescribed Naproxen. (Tr. at 279.)

Plaintiff completed out-patient physical therapy for his back in December 2002. (Tr. at 275-77; 576-78; 605; 607-08.) He requested a work excuse, but NP Deringer denied the request unless something was found during therapy. (Tr. at 270; 603.)[15] In a December 13, 2002 note, NP Deringer wrote that after reviewing PT records she could not determine that plaintiff was disabled. While he had some limitations (i.e., bending and lifting more than thirty pounds), she believed that he could still participate in a work program. (Tr. at 606.)

On December 23, 2002, plaintiff saw Dr. Litza, complaining of pain in the left wrist and hand, back and right knee. (Tr. at 498.) Dr. Litza advised plaintiff that she did not think his pain rendered him unemployable and encouraged him to try to find work. (Tr. at 499.) Plaintiff saw Thompson on December 31, 2002, with his usual manner, polite but entitled, angry about

---

[15]On December 6, Thompson indicated that plaintiff's mood was "fairly stable" but "with the usual sense of entitlement." (Tr. at 271.)

jumping through hoops to get benefits. (Tr. at 605.)

On January 14, 2003, Dr. Powers made the same diagnoses as in previous exams and continued plaintiff's medications. (Tr. at 601-03; 821-22.) On January 8, 2003 and February 28, 2003, VA counselor Thompson wrote letters indicating that plaintiff's diagnoses were anxiety disorder, NOS, and poly-substance dependence in remission. Thompson indicated that plaintiff was cooperative and sincere in his efforts for continued sobriety, with negative urine screens. (Tr. at 558; 559.)

On January 22, 2003, plaintiff underwent a cervical MRI, which revealed mild degenerative changes at the upper cervical and upper thoracic disc levels but with no disc herniation or spinal cord compromise. (Tr. at 563-64.) On February 5, NP Deringer discussed the results with plaintiff, and he requested an excuse from work, which Dr. Deringer indicated was his "usual request" when he came to see her. NP Deringer indicated that after all of the tests and work-ups plaintiff did not "require[] any restrictions or limitations on his ability to work." (Tr. at 597.)

On February 27, 2003, a VA doctor assessed possible shoulder impingement and referred plaintiff for physical therapy (Tr. at 590-91), but a March 2, 2003, right shoulder x-ray was normal (Tr. at 562; 574). On March 17, plaintiff was evaluated for physical therapy related to his right shoulder pain and scheduled for treatment once per week for four to six weeks. (Tr. at 570-73.) On March 25, plaintiff reported that his shoulder was a little better, but he had not been using it much. (Tr. at 585.)[16]

---

[16]On April 3, plaintiff reported more right shoulder pain (Tr. at 582), and on April 15, he complained of more right arm numbness (Tr. at 581). On April 22 and May 1, plaintiff reported that his shoulder felt about the same, but he was having less tingling. (Tr. at 579-80.)

19

On March 26, plaintiff returned to Dr. Powers, who made the same diagnoses and continued his medications including Seroquel and Gabapentin.  (Tr. at 583-85; 819.)  On April 14, he saw Thompson with his usual presentation, easily frustrated and with a sense of entitlement but polite and well mannered.  (Tr. at 582.)  Plaintiff returned to Thompson on May 6, well behaved and polite but easily irritated and impulsive.  (Tr. at 579.)

Plaintiff saw Dr. Powers on October 16, 2003 and January 21, 2004, and she made the same diagnoses and continued his medications.  (Tr. at 814; 816.)  On July 28, 2004, Dr. Powers again assessed poly-substance dependence and anxiety, NOS, with a GAF of 55.  (Tr. at 656-57; 796-97.)  She started him on Celexa and continued his other medications.  (Tr. at 658.)

On August 16, 2004, plaintiff underwent a rheumatology consult related to his complaints of hand, hip and shoulder pain.  Plaintiff indicated that he had received injections and multiple courses of PT, which did not help.  The exam revealed no evidence of inflammatory arthritis.  (Tr. at 642-52.)

On August 17, NP Hess saw plaintiff, indicating that although plaintiff claimed an inability to work, he saw no physical reason in the chart that would keep him from working.  Plaintiff also claimed that he could not keep an appointment prior to 2:00 p.m., but Hess also found this hard to explain.  (Tr. at 625-26.)

On August 25, VA psychologist Cheryl Kinsman evaluated plaintiff and diagnosed general anxiety, dysthymia and a personality disorder with avoidant and schizotypal features, with a GAF of 50.[17]  (Tr. at 631.)  On August 27, plaintiff underwent an upper GI test at the

---

[17]Such a score is indicative of severe symptoms.  Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

VAMC, which was unremarkable aside from spontaneous gastroesophogeal reflux. (Tr. at 622.)

Plaintiff returned to Dr. Powers on October 15, 2004 (Tr. at 787), January 26, 2005 (Tr. at 783) and April 28, 2005 (Tr. at 777), and she continued to assess plaintiff with anxiety, NOS, with a GAF of 55. Plaintiff also continued to complain of severe knee and back pain during visits with NP Hess (who took over plaintiff's primary care from NP Deringer at the VAMC) in 2004 and early 2005. Plaintiff continued to tell NP Hess that he could not work, but Hess could not understand why from a physical standpoint. (Tr. at 802; at 812.) NP Hess noted that plaintiff underwent numerous courses of physical therapy for his back, hip, rotator cuff and shoulder between 2000 and 2003. (Tr. at 809.) NP Hess noted basically normal exams and full range of motion and encouraged plaintiff to exercise. Plaintiff declined further physical therapy and was provided non-narcotic medications. (Tr. at 784-87; 790-93; 795.)

## D. SSA Consultants' Reports

The SSA arranged for plaintiff's claim to be evaluated by several experts. On October 10, 2002, a state agency consultant completed a physical RFC report, opining that plaintiff could lift ten pounds occasionally, less than ten pounds frequently, stand/walk two hours in an eight hour work day, and sit about six hours in an eight hour day (Tr. at 237), abilities consistent with "sedentary" work. See 20 C.F.R. § 404.1567(a). The consultant concluded that plaintiff had no postural, manipulative or other limitations. (Tr. at 238-43.) On February 10, 2003, a second state agency medical consultant completed a physical RFC report, concluding that plaintiff could lift up to twenty pounds occasionally, ten pounds frequently; stand/walk about six hours in an eight hour day; and sit about six hours in an eight hour day; with no other limitations (Tr. at 531-38); abilities consistent with "light" work. See 20 C.F.R. § 404.1567(b).

21

On October 11, 2002, a state agency psychologist completed a psychiatric review technique form for the SSA, evaluating plaintiff under Listings 12.04, Affective Disorders, 12.06, Anxiety-Related Disorders, and 12.07, Somatoform Disorders. (Tr. at 543.) He assessed mild limitations of activities of daily living ("ADL's"), social functioning, and concentration, persistence and pace, and one or two episodes of decompensation. (Tr. at 553.) In a mental RFC report, the consulting psychologist assessed moderate limitations in nine work-related areas and no significant limitations in the remaining eleven areas. (Tr. at 539-40.) Another state agency psychologist reviewed and approved these reports on February 10, 2003. (Tr. at 541; 543.)

Finally, on November 11, 2004, plaintiff underwent a psychological evaluation with Roland Manos, Ph.D, which ALJ Senander ordered at the conclusion of the hearing. (Tr. at 996; 1013.) Plaintiff complained of chronic pain in numerous parts of his body and daily fatigue. (Tr. at 1017.) On mental status exam, Dr. Manos found plaintiff oriented times three and in no apparent distress, although he required repeated interruption and redirection. Plaintiff reported feeling depressed on a regular basis and anxious most of the time. He also reported sleeping nineteen hours per day, being irritable and socially withdrawn. He complained of hearing a voice telling him to kill himself and of seeing shadows running across the floor. Although plaintiff complained of poor memory and concentration, he was a fairly good historian and able to repeat three of three unrelated items immediately following their presentation and remembered two of the items after five minutes. (Tr. at 1019-20.) His insight and judgment were questionable. As far as daily activities, plaintiff reported doing little more than eating, sleeping and watching TV, and described himself as a loner. He stated that he did not concentrate well, which was consistent with his interview behavior. (Tr. at 1021.) Dr.

22

Manos summarized that plaintiff did not appear to be anxious or depressed, but did appear to lack insight into the impact he had on others, with rambling and tangential speech. Dr. Manos believed that the duration of these symptoms indicated the presence of a personality disorder. Dr. Manos diagnosed depressive disorder, NOS; cocaine and alcohol dependence, in remission; personality disorder, NOS, with schizoid and schizotypal features; and a GAF of 50. He opined that plaintiff's prognosis was guarded. (Tr. at 1022.) Regarding plaintiff's work capacity, Dr. Manos opined that plaintiff was able to understand and remember simple instructions, and his ability to respond appropriately to others including supervisors and co-workers was marginal but not entirely precluded. Plaintiff reported difficulty maintaining concentration but seemed able to handle routine work stress and to adapt to changes. (Tr. at 1022-23.) In an accompanying mental assessment report, Dr. Manos opined that plaintiff's ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, deal with complex instructions, behave in an emotionally stable manner, relate predictably in social settings, and demonstrate reliability was "fair" (i.e., "seriously limited but not precluded"); his ability to function independently and deal with simple job instructions was "good" (i.e., "limited but satisfactory"); and his ability to maintain attention/concentration and personal appearance was fair to good. (Tr. at 1024-25.) Dr. Manos wrote that plaintiff had below average memory and concentration, and impaired social adjustment due to his personality disorder. (Tr. at 1025.)

## E.    ALJ's Senander's Decision

On April 27, 2005, ALJ Senander issued an unfavorable decision. Applying the five-step test, the ALJ concluded that plaintiff had not worked since his alleged onset date of May 17, 2002, and that he suffered from severe impairments, including hepatitis C and a personality

23

disorder, neither of which met a Listing. (Tr. at 27-29.) The ALJ then determined that plaintiff retained the RFC for low stress, light work, involving one or two steps and no contact with the public. (Tr. at 29.) Based on this RFC and relying on the testimony of the VE, the ALJ concluded that plaintiff could not return to his past work but could perform other jobs such as material handler, food preparation worker and dishwasher.[18] (Tr. at 30-31.)

Plaintiff asked the Appeals Council to again review the ALJ's decision (Tr. at 729-31),[19] but this time the Council denied his request (Tr. at 8).

### III. DISCUSSION

Plaintiff argues that the ALJ: (1) failed to use the appropriate "special technique" in evaluating his mental impairments; (2) erred in setting his RFC; (3) improperly evaluated the credibility of his testimony; and (4) failed to consider his claim under the appropriate Listing.

### A.    Special Technique

#### 1.    Legal Standard

When the claimant alleges disability due to a mental impairment, the ALJ must apply a "special technique" in evaluating the claim. 20 C.F.R. 404.1520a(a). Under this technique, the ALJ first considers whether, under the "A criteria" of the Listings, the claimant has a medically

---

[18]The ALJ did not adopt the limitation on use of the right arm contained in his second hypothetical to the VE. Under the first hypothetical, the VE opined that the person could perform plaintiff's past janitorial work. Nevertheless, the ALJ denied the claim at step five rather than step four.

[19]With his request, plaintiff submitted a mental RFC questionnaire from Dr. Powers, in which she indicated that plaintiff was unable to meet competitive standards in various work-related areas and would be absent more than four days per month due to his symptoms. (Tr. at 740-45.) However, because the Council denied review, I cannot consider this evidence in reviewing the ALJ's decision. See Eads v. Sec'y of Dept. of Health and Human Services, 983 F.2d 815, 817 (7th Cir. 1993).

24

determinable mental impairment.[20]  § 404.1520a(b)(1).  If so, the ALJ must under the "B

criteria" rate the degree of functional limitation resulting from the impairment.  §

404.1520a(b)(2).  The B criteria have four components: activities of daily living ("ADLs"); social

functioning; concentration, persistence or pace; and episodes of decompensation.  §

404.1520a(c)(3).  The ALJ rates the degree of limitation in the first three areas using a

five-point scale: none, mild, moderate, marked and extreme, and the degree of limitation in the

fourth (episodes of decompensation) using a four-point scale: none, one or two, three, four or

more.  The last point on each scale represents a degree of limitation that is incompatible with

the ability to do any gainful activity.  § 404.1520a(c)(4).  Certain Listings may also be met if the

claimant has marked limitations in two areas.  See, e.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1,

§ 12.04(B).  On the other hand, if the ALJ rates the degree of limitation as "none" or "mild," he

may generally find that the claimant has no severe mental impairment. § 404.1520a(d)(1).  The

ALJ must document application of this technique and include a specific finding as to the degree

of limitation in each of the functional areas in his decision.  § 404.1520a(e)(2).

   If the claimant's mental impairment is severe but does not meet or equal a Listing, the

ALJ must assess the claimant's mental RFC. § 404.1520a(d)(3).  The mental RFC assessment

requires consideration of an expanded list of work-related capacities, including the ability to

understand, carry out and remember instructions, and to respond appropriately to supervision,

coworkers and customary work pressures in a work setting.  Wates v. Barnhart, 274 F. Supp.

2d 1024, 1036-37 (E.D. Wis. 2003) (citing SSR 85-16).

---

   [20]The paragraph A criteria substantiate medically the presence of a particular mental
disorder.

### 2.    Analysis

In the present case, the ALJ found that plaintiff had severe mental impairments, but, as plaintiff notes, he failed to specifically evaluate the functional limitations resulting from those impairments under the B criteria.  The Commissioner acknowledges the error but contends that it is harmless because the evidence supports no more than mild limitations in the four broad areas of functioning.  The Commissioner notes that the ALJ credited the opinions of the state agency mental health consultants (Tr. at 30), who found only mild limitations under the B criteria (Tr. at 553).

Plaintiff counters that the regulation is written in mandatory language.   20 C.F.R. 404.1520a(b)(2) (stating that the ALJ "must rate the degree of functional limitation") (emphasis added).  However, this shows only that the ALJ erred.  As the Seventh Circuit has noted, "in administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision."  Sanchez v. Barnhart, 467 F.3d 1081, 1082-83 (7th Cir. 2006).  Plaintiff points to no medical opinion that he meets the B criteria, and absent some reason to think that the ALJ would reach a different result if required to specifically apply the special technique, remand on this basis would be pointless.  See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").[21]

_____

[21]I address plaintiff's claims related to Dr. Manos's report and the ALJ's mental RFC finding below.

Case 2:06-cv-01327-LA   Filed 10/29/07   Page 26 of 40   Document 26

**B.    RFC**

**1.    Legal Standard**

RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. In setting RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the claimant.  Exertional capacity refers to the claimant's abilities to perform seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling.  Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) activities.  The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence.  The ALJ must also explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. Patterson v. Barnhart, 428 F. Supp. 2d 869, 885-86 (E.D. Wis. 2006) (citing SSR 96-8p).

**2.    Analysis**

In the present case, the ALJ found that plaintiff retained the RFC for low stress, one or two step jobs that involve no contact with the general public and do not exceed the light exertional category.  (Tr. at 29.)  Plaintiff argues that the ALJ failed to consider his mental limitations, physical limitations, and to analyze all of the evidence in setting RFC.

27

### a. Mental Limitations

#### i. Dr. Manos's Report

Plaintiff first contends that while the ALJ appeared to credit Dr. Manos's report, he failed to account for all of the limitations contained therein. Specifically, plaintiff notes that Dr. Manos found that he was "seriously limited" in his ability to respond appropriately to others, including supervisors and co-workers; use judgment; behave in an emotionally stable manner; relate predictably in social settings; and demonstrate reliability.[22] (Tr. at 1024-25.) Plaintiff's argues that the ALJ's RFC of simple, low stress work with no public contact failed to include these additional limitations.

The ALJ must consider a medical report in its entirety, rather than selecting and discussing only those portions supporting his conclusion. See Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000). While the ALJ's decision in the present case was largely consistent with Dr. Manos's report, there appear to be some differences that the ALJ failed to appreciate.

I first note that Dr. Manos found plaintiff "seriously limited, but not precluded" in the above listed areas. Thus, his report does not support the notion that plaintiff had no ability to perform at competitive standards in these areas. Further, to the extent that the ALJ limited plaintiff to low stress (i.e., not demanding in terms of quantity or intensity, Tr. at 1005), one or two step jobs involving no public contact, his RFC appears to take into account Dr. Manos's concerns about plaintiff's judgment, reliability and emotional stability. Such jobs would appear to involve little "judgment"; and, because they would also not involve strict production requirements or other stressful demands, plaintiff's deficits in reliability and emotional stability

---

[22]Dr. Manos rated plaintiff's abilities in these areas as "fair," but the form report defined "fair" as "seriously limited, but not precluded." (Tr. at 1024.)

28

would also not appear to preclude the work. Where the ALJ did not seem to fully appreciate Dr. Manos's report was in the area of dealings with others; the ALJ limited plaintiff to jobs involving no contact with the general public, but he did not limit plaintiff's contact with supervisors and co-workers, as Dr. Manos's report suggests may be necessary. It may be that the jobs the ALJ cited do not involve extended contact with others, but neither he or the VE explicitly said so. Therefore, giving plaintiff the benefit of this doubt, I conclude that the matter must be remanded for reconsideration of Dr. Manos's report.[23]

### ii. State Agency Doctors

Plaintiff next contends that the ALJ failed to address the various "moderate" limitations contained in the mental RFC reports of the state agency reviewers. (Tr. at 539-40.) But plaintiff fails to explain how these limitations erode his ability to work at the RFC level set forth by the ALJ. To the extent that the doctors found moderate limitations in plaintiff's ability to

---

[23]In a footnote, plaintiff cites a Tenth Circuit case in which the court equated a "fair" rating (i.e., "seriously limited, but not precluded") with a "marked" impairment under the B criteria of the Listings and considered such rating as evidence of disability rather than ability. Cruse v. Dept. of Health & Human Services, 49 F.3d 614, 618 (10th Cir. 1995). However, as both the Sixth and Eighth Circuits have noted, Cruse cannot be interpreted to stand for the proposition that a "fair" rating means the person cannot work. Because the form at issue also contains a rating of "poor/none," which applies when the person has "no useful ability to function" in the area (Tr. at 1024), a "fair" rating simply must be considered along with all of the other evidence in deciding disability. Colvin v. Barnhart, 475 F.3d 727, 731 (6th Cir. 2007) (citing Cantrell v. Apfel, 231 F.3d 1104, 1107-08 (8th Cir. 2000)). I agree with the Sixth and Eighth Circuits on this issue. Further, it seems improper to consider this form, which does not align with the B criteria, as clear evidence that a person meets a Listing. In the present case, plaintiff fails to persuasively link the findings in Dr. Manos's report to the B criteria. I also note that Dr. Manos did not, in his narrative report, state that plaintiff was disabled. Rather, he concluded that plaintiff could withstand routine work stress and adapt to change, and could understand and remember simple instructions. (Tr. at 29; 1022-23.) These are the basic mental abilities needed for unskilled work. See SSR 85-16. As the ALJ also noted, Dr. Manos found plaintiff to be a fairly good historian, who did not appear to be anxious or depressed during the interview. (Tr. at 29; 1019-20.)

29

concentrate for extended periods, understand and follow detailed instructions, perform at a consistent pace, accept criticism, respond appropriately to others and maintain socially appropriate behavior, the ALJ limited plaintiff to low stress work involving one or two-step tasks and no contact with the general public.  (Tr. at 30.)  The ALJ noted that the state agency doctors concluded that plaintiff's "basic mental work skills remain intact" (Tr. at 30), and plaintiff points to nothing in the reports to the contrary.  Therefore, the ALJ did not err in this regard.[24]

### b.    Physical Limitations/Dr. Litza's June 2002 Reports

Plaintiff next contends that the ALJ failed to account for Dr. Litza's June 2002 reports in assessing his physical RFC.  Dr. Litza opined that he could stand/walk about two hours in an eight hour work day; could occasionally lift ten pounds but rarely lift more; would be absent more than four days per month based on his impairments; and could only work part-time.  (Tr. at 174; 176A; 180.)  Plaintiff argues that the ALJ failed to resolve the inconsistency between Dr. Litza's report and the RFC for light work, and that such failure is aggravated by the fact that Dr. Litza is a treating source.  See Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001) (discussing the "special consideration" the ALJ must afford treating source reports).

The ALJ stated that Dr. Litza's June 2002 reports suggested that plaintiff could meet the exertional demands of a wide range of light work.  (Tr. at 27; 28.)  However, the ALJ failed to address the two-hour limitation on standing/walking contained in the June 24 (Tr. at 174) and June 26 (Tr. at 179) reports.  A person who cannot be on his feet more than two hours per workday cannot perform a wide range of light work.  See, e.g., SSR 83-10 (stating that "the full

---

[24]It appears that Dr. Manos believed plaintiff more limited in his ability to relate to others than the state agency consultants.

30

range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday"). The ALJ erred by failing to resolve this inconsistency. See, e.g., Kilps v. Barnhart, 250 F. Supp. 2d 1003, 105 (E.D. Wis. 2003) (reversing where ALJ failed to resolve material inconsistency between RFC and treating source report). Because adoption of this restriction would appear to eliminate the jobs the ALJ found plaintiff can do, the error is not harmless.[25]

As the Commissioner notes, Dr. Lizta's reports are inconsistent in some respects. For example, in the first June 24 report, she states that plaintiff can sit about four hours per workday and rarely lift more than ten pounds (Tr. at 174); but in the second June 24 report, she imposed no limitation on sitting and indicated that plaintiff can occasionally lift up to twenty pounds (Tr. at 176). Further, in a December 23, 2002 treatment note, Dr. Litza wrote: "I told him that I did not think any of his pain was significant in regard that he is unemployable or would not be able to work. I encouraged him to continue trying to find employment." (Tr. at 499; see also Tr. at 30.)[26] However, the ALJ did not reject Dr. Litza's opinions based on such inconsistencies, and I may not rely on the Commissioner's post hoc rationale to do so now. See, e.g., Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law

---

[25]The VE did not identify sedentary jobs plaintiff could also perform.

[26]It may be, as plaintiff argues in his reply brief, that Dr. Litza was referring to part-time work in this note. I leave the proper interpretation of this note to the ALJ on remand. I further recognize that on January 15, 2002, Dr. Litza told plaintiff that she believed low stress work would be beneficial for him (Tr. at 519) and on August 9, 2002, after reviewing his x-ray results recommended regular exercise to strengthen the muscles around the joints (Tr. at 506). Again, I leave to the ALJ the significance of these notes. The ALJ may be well-advised to re-contact Dr. Litza for clarification.

31

require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."). Nor did the ALJ attempt to re-contact Dr. Litza to clarify her opinions. See SSR 96-5p (stating that the ALJ should re-contact a treating source when the bases for her opinions are not clear); Gossett v. Chater, 947 F. Supp. 1272, 1280 (S.D. Ind.1996) (finding that the ALJ had a duty to re-contact physician for clarification if he believed physician's questionnaire responses were inconsistent with statements made by him in an earlier report). Rather, he ignored the inconsistencies. Therefore, the matter must be remanded for reconsideration of Dr. Litza's June 2002 reports.[27]

### c. Failure to Analyze Other Evidence

Plaintiff also argues that the ALJ failed to consider his other physical impairments, such as gastritis, headaches and stomach pain. It is true that the ALJ must consider all of the claimant's impairments, severe and non-severe, in setting RFC. SSR 96-8p. However, plaintiff fails to identify any additional limitations on his ability to work the ALJ should have imposed based on these conditions. Therefore, I cannot conclude that the ALJ's failure to specifically mention all of them is more than harmless error.

---

[27]The ALJ cited statements from a VA NP that plaintiff did not require "any restrictions or limitations on his ability to work." (Tr. at 28; 597.) It may be that the ALJ will decide that this evidence is sufficient to permit him to reject Dr. Litza's more severe restrictions. But without some indication of that in the decision, I cannot affirm. The ALJ also credited the opinions of the state agency consultants, which, he said, concluded that plaintiff could perform light work. (Tr. at 30; 237-43; 531-38.) However, only one of the consultant's adopted a light RFC; the other limited plaintiff to sedentary work (Tr. at 237), which the ALJ also did not acknowledge. The ALJ must resolve the inconsistency on remand. See also 96-6p (stating that ALJs may not ignore state agency consultants' opinions and must explain the weight given to these opinions in their decisions).

32

**C.    Credibility of Plaintiff's Allegations of Disabling Pain and Fatigue**

    **1.    Legal Standard**

SR 96-7p establishes a two-step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness.  First, the ALJ must consider whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work.  SSR 96-7p.

Second, if an underlying impairment that could reasonably be expected to produce the claimant's symptoms has been shown, the ALJ must determine the extent to which the claimed symptoms limit the claimant's ability to work.  If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record.  SSR 96-7p.

The "ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication the claimant takes; treatment other than medication; any other measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  While the ALJ need not elaborate on each of these factors when making a credibility determination, he must sufficiently articulate his assessment of the evidence to

assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Windus v. Barnhart, 345 F. Supp. 2d 928, 946 (E.D. Wis. 2004); see also Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003) (stating that the ALJ must sufficiently articulate the reasons for his credibility determination).

So long as he applies the correct legal standards, the reviewing court will generally defer to the ALJ's credibility determination, Windus, 345 F. Supp. 2d at 945, reversing only if it is "patently wrong," Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). However, when the ALJ bases his credibility determination on objective factors or fundamental implausibilities rather than subjective considerations, courts have greater freedom to review the ALJ's decision. Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

### 2. Analysis

In the present case, the ALJ found plaintiff's claims of disabling pain and fatigue "not totally credible for the reasons set forth in the body of this decision." (Tr. at 32.) Within the decision, the ALJ noted the lack of support for plaintiff's claims in the objective medical evidence, the fact that plaintiff did not take strong narcotic pain medications, and his personal observations of plaintiff at the hearing. (Tr. at 30.) Plaintiff argues that the ALJ failed to consider the side effects of his medication in evaluating the credibility of his claims of disabling fatigue and applied an improper "sit and squirm" test in evaluating the credibility of his claims of disabling pain.

### a. Medication Side Effects

Plaintiff testified that his medications made him drowsy and that as a result he slept nineteen hours per day. (Tr. at 979-80.) The ALJ concluded that plaintiff's claims of

34

medication side effects were "not supported by his presentation or demeanor at his hearing, his findings on clinical examination, or any expert treating or examining physician opinion evidence." (Tr. at 30.) However, as plaintiff notes, treating source Dr. Powers twice wrote letters recommending afternoon appointments due to the sedating effects of his medications (Tr. at 618-19), which the ALJ failed to consider. Plaintiff also cites the Physicians' Desk Reference, Medical Dictionary, which lists somnolence and dizziness as common side effects of several of his medications.[28]

The Commissioner notes that plaintiff's hearing occurred at 9:45 a.m., and the ALJ did not observe him to be fatigued. Plaintiff responds that the ALJ is "not free to accept or reject [the] individual's complaints solely on the basis of . . . personal observations." SSR 96-8p. As I will discuss later in this decision, ALJs may consider the claimant's demeanor as part of the calculus in evaluating credibility. On this issue, however, the ALJ's oversight in discussing the objective medical evidence gives me greater freedom to review his determination.

The Commissioner also notes that Dr. Litza specifically stated that plaintiff had no medication side effects impacting his ability to work. (Tr. at 176A.) However, the ALJ did not cite this evidence, and as noted above, my review is limited to the reasons he supplied. Because plaintiff's extreme fatigue, if accepted, would appear to preclude all full-time work, I cannot conclude that the ALJ's error in analyzing this issue was harmless. The ALJ must take another look at this issue on remand. See Patterson, 428 F. Supp. 2d at 882 (remanding where "the ALJ failed to discuss any medication side effects").

---

[28]The medical records also reveal that plaintiff apparently slept through a 10:00 a.m. appointment with Dr. Demuri at the VAMC, which he blamed on his medication. Dr. Demuri discontinued the medication. (Tr. at 487-88.)

### b. Pain and Fatigue

The ALJ accepted that plaintiff experienced some fatigue and weakness due to his chronic hepatitis and other ailments, which would preclude strenuous work. (Tr. at 30.) However, the ALJ believed that plaintiff did not suffer symptoms of such severity as to preclude light work. The ALJ wrote that he "carefully observed the claimant and did not find him to be a person who appeared to be experiencing disabling pain or fatigue on the date of his hearing." (Tr. at 27; see also Tr. at 30 ["The claimant also did not appear (in the undersigned's opinion) to be experiencing disabling pain or fatigue on the date of his hearing."].)

Several courts have condemned the use of a so-called "sit and squirm" test, in which an ALJ watches a social security claimant at the hearing to see if he acts like he is in pain. Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Miller v. Sullivan, 953 F.2d 417 (8th Cir. 1992); Myers v. Sullivan, 916 F.2d 659 (11th Cir. 1990); Jenkins v. Sullivan, 906 F.2d 107 (4th Cir. 1990); Lovelace v. Bowen, 813 F.2d 55 (5th Cir.1987)). The Seventh Circuit has stated that:

> we are uncomfortable with it as well. We doubt the probative value of any evidence that can be so easily manipulated as watching whether someone acts like they are in discomfort. However, we note that even those courts cited by Powers as opposing the "sit and squirm" test endorse the validity of a hearing officer's observations of the claimant. Likewise, we have repeatedly endorsed the role of observation in determining credibility and refuse to make an exception in this situation.

Id. (internal citations omitted).

Precisely because of their superior vantage point, appellate tribunals typically defer to the credibility findings of trial judges and hearing examiners. See, e.g., Aviles v. Cornell Forge Co., 241 F.3d 589, 594 (7th Cir. 2001) (stating that the court of appeals defers to a trial judge's fact-finding determinations "because of the trial court's superior ability to judge the credibility

36

of the witnesses"); <u>United States v. Jensen</u>, 169 F.3d 1044, 1046 (7th Cir. 1999) ("We defer

to the trial court's credibility determinations because only the trial judge can be aware of the

variations in demeanor and tone of voice that bear so heavily on the listener's understanding

of and belief in what is said.") (internal quote marks omitted); <u>Edwards v. Sullivan</u>, 985 F.2d

334, 338 (7th Cir. 1993) (stating that determinations of credibility often involve intangible and

unarticulable elements that impress the ALJ, which leave no trace that can be discerned in the

transcript). It is inconsistent with this well-established rule of appellate review to flatly reject an

ALJ's observations of a social security claimant's demeanor or mannerisms.[29] Thus, in <u>Powers</u>,

the Seventh Circuit upheld the ALJ's credibility finding based in part on the ALJ's personal

observations, stating:

> The hearing officer had an opportunity to observe Powers for an extended period of time and could gauge whether her demeanor, behavior, attitude and other characteristics suggested frankness and honesty and were consistent with the general bearing of someone who is experiencing severe pain. Also, because the witness showed no signs of pain, there is no danger that she attempted to manipulate the hearing officer by squirming. As one of several factors that contributed to the hearing officer's credibility determination, we cannot say this rendered that judgment "patently wrong."

<u>Id.</u>

In the present case, I see no error in the ALJ's consideration of plaintiff's demeanor at

the hearing, along with the other evidence in the record. Plaintiff does not dispute the fact that

his claims of disabling pain have little or no support in the medical records or the reports of

---

[29]Courts' wariness of the sit and squirm test seems to stem both from its potential for abuse and the rule against lay ALJs making their own medical determinations. As the court noted in <u>Powers</u>, however, this does not mean that the ALJ must ignore what he sees at the hearing. Prohibiting ALJs from considering their own observations leaves them in a nearly impossible situation: findings based on "objective" factors are subject to more searching appellate review, and findings based on "subjective" considerations are forbidden.

37

treating sources.  Thus, I cannot conclude that the ALJ erred in considering plaintiff's appearance at the hearing.

Plaintiff also disputes the ALJ's statement that he "is not maintained in strong narcotic pain medication" (Tr. at 30), but he fails to show that the ALJ erred in this regard.  Plaintiff was prescribed pain medication from time to time, but not strong narcotics.  (See, e.g., Tr. at 795.) As the ALJ also noted, plaintiff's treating physicians did not endorse his complaints of disabling pain.  (Tr. at 30; see, e.g., Tr. at 802.)

Finally, plaintiff complains that the ALJ failed to evaluate the frequency and intensity of his pain, precipitating and aggravating factors, or other measures he used for relief.  However, the ALJ need not comment in writing on each every one of the seven credibility factors in SSR 96-7p; rather, he need only provide an explanation sufficient to assure the court that he considered the important evidence, building an accurate and logical bridge from the evidence to the conclusion.  See, e.g., Beth v. Astrue, 494 F. Supp. 2d 979, 1004 (E.D. Wis. 2007); Clay v. Apfel, 64 F. Supp. 2d 774, 781 (N.D. Ill. 1999).  The ALJ did so in the present case.

**D.    Listing**

**1.    Legal Standard**

The claimant bears the burden of showing that his impairment meets a Listing, which requires him to satisfy each of the specific criteria in the relevant section.  Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir.1999).  In evaluating a claim at step three, the ALJ should mention the specific Listings he is considering; his failure to do so, if combined with a perfunctory analysis of the relevant evidence, may require a remand.  Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006) (citing Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir.

38

2003)).

 2. **Analysis**

Plaintiff argues that the ALJ failed to determine whether he met or equaled the Listing for personality disorders, 12.08. In fact, the ALJ never mentioned this Listing in his decision. However, as discussed above, the ALJ's failure to specifically evaluate the B criteria appears to be harmless error.

In order to meet this Listing, plaintiff must also have "marked" limitations in two functional areas under the B criteria. Relying on Dr. Manos's finding of several "fair" limitations, and the Tenth Circuit's <u>Cruse</u> decision equating "fair" with "marked," plaintiff contends that he meets the Listing.

As discussed in note 23 above, I have doubts about <u>Cruse</u>'s conclusion on this issue. Further, nothing in Dr. Manos's report otherwise suggests that he considered plaintiff disabled. Finally, as the ALJ noted, the state agency physicians, who directly addressed the B criteria, found no more than mild limitations. (Tr. at 30; 553.) Nevertheless, because I am remanding for further consideration of Dr. Manos's report on the issue of mental RFC, plaintiff may also ask the ALJ to consider whether the report supports a claim under the Listings.

**E. Remedy**

Plaintiff contends that I should reverse with directions that benefits be awarded. Ordinarily, when an ALJ errs, the appropriate remedy is to remand for further proceedings. Only if all essential factual issues have been resolved and the record clearly supports a finding of disability should the court direct that the application be granted and benefits be awarded. <u>Briscoe</u>, 425 F.3d at 356.

39

In the present case, not all factual issues are resolved. Dr. Manos's opinion does not plainly support plaintiff's claim under the Listings, and the state agency consultants explicitly found that plaintiff did not meet a Listing. Nor do Dr. Litza's June 2002 reports definitively support a finding of disability, given the contrary statements in her treatment notes and the statements from VA treating sources who consistently opined that plaintiff could work. Therefore, the matter must be remanded.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of October, 2007.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

40